C. & A. R. R. Co. v. McDonald.

## CHICAGO & ALTON RAILROAD COMPANY

v.

## SYLVESTER MCDONALD.

*Railroads—Duty to Prevent Collisions—Liability for Personal Injury to Employe—Conductor and Engineer of Construction Train and Shoveler, Fellow-Servants—Company not Liable for Injury to Shoveler.*

1. Railroad companies are by the law held to a high degree of care and diligence in the adoption and enforcement of all needful rules and regulations to avoid collisions of trains, and thereby promote the safety of their employes and others.

2. The conductor and engineer of a construction train and a shoveler employed on such train, are fellow servants engaged in the same branch of service, and their common master is not liable for an injury to the shoveler through the negligence of the conductor and engineer, or either of them.

3. In the case presented, it is *held:* That the collision causing the injury complained of was due to the negligence of the conductor, superinduced by the inexcusable carelessness or wilfulness of the engineer; and that, under all the circumstances, it was not reasonably necessary to prevent the collision for the train dispatcher to notify the conductor of the construction train that the regular passenger train was late, it being the duty of the latter, under his working orders and the general rules, to wait until the passenger train had passed.

[Opinion filed March 9, 1887.]

APPEAL from the City Court of East St. Louis; the Hon. WILLIAM P. LAUNTZ, Judge, presiding.

Statement of the case by WILKIN, P. J. On the morning of May 13, 1886, appellee, who was employed by appellant, took passage with other laborers on a construction train of appellant, consisting of locomotive engine and caboose car, at Higbee, Missouri, a station on the line of appellant's railroad. This crew of laborers had over them a foreman named Cavenaugh, also employed by appellant. The train was in charge of a conductor, O. F. Culbertson, who controlled and directed its movements. On the morning in question, about 7 o'clock A. M., conductor Culbertson received from F. M. White, the

chief train dispatcher, the following order for the movement of his train on said day, viz:

"SLATER, Mo., May 13, 1885.

To Paine and Engineer Culbertson and Engineer Wright and engineer at Highbee; Paine, Culbertson and Wright, engines 204, 194 and 200, will work between Highbee and Clark, as three wild trains, and make arrangements to keep out of each other's way, and work until 7.40 P. M. regardless of train 74, Conductor Gibbs, engine 168; all other trains due have passed."

He was also supplied with a copy of the general rules of appellant, which were introduced by appellee, and by which he testifies he was governed; among which are the following:

Rule 1 gives trains going north and ea-t absolute right of road over all trains going south or west, of the same class. Prohibits trains going north or east leaving stations or passing places where by time table they should pass trains of same class, until five minutes after its own time, per table; the five minutes to be observed at every succeeding station until the expected train is passed.

Rule 5. Provides that "the safe side must always be taken in cases of the least uncertainty"; that trains are to be run under the direction of the conductor, except when his directions conflict with train orders, etc.

Rule 8. "Irregular trains, running under special telegraph orders, must be run with great care."

Rule 20. "Division superintendents and appointed train dispatchers are alone authorized to move trains by telegraph."

Rule 28 is as follows: "Conductors of construction trains must notify the train dispatcher every evening, from the nearest telegraph office, where they desire to work the following day, and obtain working orders, a copy of which the engineer must have before starting out to work. Those orders, unless otherwise stated, will be in force from 6 A. M. until 8 P. M. only. Conductors must ascertain also the positions of all trains, and learn positively that all trains due during the night have arrived or passed, and under no consideration pass the limits given without permission." This train went east some eight

C. & A. R. R. Co. v. McDonald.

or nine miles, near Clark station, and proceeded to work on a new piece of road-bed, intended to straighten the track, the men shoveling on the cars under the directions of their fore- man and the conductor moving the train as directed by him. The dirt, however, was not moved off the new line that day, and hence the train only used the main line in going to and attempting to return from the work, its headquarters being at Higbee. This train, with the same conductor, had been en- gaged in this work two months. About 6 o'clock in the evening the conductor started his train, with appellee and other laborers aboard, back to Higbee, but had only gone a short distance on the main line when he collided with passen- ger train No. 47, east bound, some six hours late. Appellee, to avoid the consequences of the collision, jumped from the caboose of the work train, thereby receiving the injury for which he brings this suit. The injury complained of is hernia, and the evidence was sufficient to justify the jury in finding that it was occasioned by the fall in jumping from the car, to avoid the wreck of the two trains; also that the injury is per- manent, and to some extent disables him for the performance of manual labor. In the first count of his declaration he bases his right to recover on the allegation that his injury resulted from the negligence of the servants of appellant in running and operating the said construction train; in the second, that the collision of the two trains and his consequent injury was caused by the negligence and fault of the train dispatcher; in the third, that the injury resulted from a failure on the part of appellant to have an office or stopping place for trains at the junction of the new work with the main track. The train dispatcher for this division of appellant's road had his office at Slater, Missouri, west of the place of the collision. About 8:30 A. M. that day he knew that No. 47 was being delayed by a wreck west of his station, and about 9:40 A. M. he sent an order to trains east giving all trains the right to use four hours on the time of train 47. This order was delivered to Paine and Wright (through Conductor Young, of train No. 99), the other two conductors of construction trains leaving Higbee that morning, but not to Culbertson. Afterward an-

other order was sent giving certain trains five hours and thirty minutes on the time of No. 47, but it was not sent to either of the three construction trains. It does not definitely appear from the evidence whether Paine and Wright were on the new work exclusively or not, but the train dispatcher testified that the reason he sent the order giving four hours on the time of No. 47 to them, and not to Culbertson, was because they were working on the main line, and could not occupy it against passenger trains without special telegraph orders, while his work was on a portion of the new line not used by regular trains.

Appellee introduced Conductor Culbertson, and as to his conduct in moving his train out on the main line against No. 47, he was interrogated and answered as follows: Do you know when No. 99, Young, conductor, passed over the main line? Answer. I do. Were any of your men at the main line, when the train went, to watch for orders? Answer. Yes; I was there myself. * * * I should say it was between 9 and 10 o'clock. I received no signal more than throwing up the hand. * * * The fireman and myself went up to the junction when train No. 75 passed. It was a freight train and it was about 12:20 or 12:25 o'clock. What has been your custom previous to the 13th of May in regard to the time of returning to Higbee after work? No matter where we were, at 6 o'clock in the evening, as soon as the men quit work, we went to Higbee every night. * * * The distance between the junction and Clark is between one and three quarters and two miles over the crooked road. Across it was about a mile. I did not go to Clark that evening to the telegraph office to get orders to find out whether all trains were on time and had passed, because I would be in just as bad shape to go to Clark as the other way, because I never protected myself against trains coming between Clark and the junction, because I had no occasion to go to the junction. The only three trains I had to protect myself against were coming east; for that reason I never paid any attention to trains the other way. I knew I had to guard in an out. A man running a work train has to fight in and out. When I took a notion to go

ahead of a train I didn't care if it was ahead or behind, if it was going the same way, when through we would go. We had some general rules issued by the company. He identified the rules and was asked : Did you have any other rules and regulations except the general rules that appear on this table? Answer. No, sir; only telegraph orders. Did you have a copy of this? Answer. Yes, sir; I have been railroading about fourteen years—running a train about nine years. Now I will ask you this question : When a passenger train, having the right of the road, is behind time according to the time table, whether it is customary and usual to send telegraphic orders to all trains running in an opposite direction, giving them time on the passenger train or notifying them that the train is behind time? Answer. Yes; it is, on all roads. It is a means of safety and of preventing collisions. The telegraph is continually used in the running of trains; very seldom a train goes over the road or half way over the division without getting a pocket full of them. If I had received the same telegraph order as the one sent to Conductors Paine and Wright on that day the collision would not have occurred. On cross-examination he testified : I received no order from the superintendent that day. I received no verbal orders; my engineer received none to my knowledge. What means had you of knowing whether train No. 47 had passed? Answer. The only means was going over there to see. Those were the means you had always adopted before that day? Answer. Yes; there is a rule that requires you to keep out of the way of regular trains. How do you do that? Answer. Get on the side track and wait. How long? Answer. Wait twelve hours if I can't get any help. And if you don't get any help in twelve hours, how long? Answer. Twelve hours and five minutes. Then how much longer? Answer. No longer. In this case how long did you wait after 47 was due? Answer. Six hours. You waited six hours? Answer. Yes, sir. You knew the time 47 was due? Answer. 12:05. How long were you to wait? It was your duty as a careful conductor to wait until you ascertained whether 47 had passed. This was not a switch? Answer. If 47 would be twelve

hours late I would lose my right. How long would you have to wait after it was due for it to pass? Answer. I said I would have to wait indefinitely because I had lost my right. You would have to wait until you had ascertained physically whether it had passed or not? Answer. Yes sir. If she was due at 12 o'clock in the day time and you hadn't found at 6 or 7 o'clock that she had passed or have reason to believe it you would not have gone out? No sir, if I hadn't reason to believe she had passed. What reason had you for believing she had passed? Answer. The engineer told me he saw her go by. What engineer told you so? Answer. My engineer, the engineer working with me. Was it not your duty to go up and see that she went by? Answer. It was my duty to go or send some one. That was your means of finding out whether No. 47 had passed or not? Answer. That was the only way, yes, that was the only way I had of knowing positively unless they sent me an order; * * * in the absence of receiving a telegraphic order or any other order it was my duty to be out there or send some one. I sent my engineer and he reported to me that he saw her go by about on time; that caused me to move out; afterwards I found out I was mistaken. Without that statement of your engineer you would not go out for a week. Answer. No, sir; I did not receive any telegraphic permission to move out that day. * * * I was working at the time of this accident under these general rules already in evidence. * * * That day I was working under rule 28; under this rule in the absence of any telegraphic orders I had to see the other train or have one of my men under my control in whom I had confidence, to tell me it had gone by; * * * failing to get an order would not have caused the accident unless I thought 47 had passed. * * * There was no work for me to do that day between the junction and Higbee. This order, 182, a working order, is the only one I received that day. On redirect examination he was asked, under this order what were your duties? Answer. My duties were to work the main line in the way I saw fit between Higbee and Clark, to keep out of the way of trains. Regular time card trains were the

ones I had to keep out of the way of. Now in case one of the regular trains was late and had lost its place on the time card, was there any way by which you could know that it hadn't passed or to know in any way to keep out of the way of that train except a telegraphic order? Answer. No, sir, not without it had lost the right to the track. No. 47 had not lost its right that day. No instructions to the jury were asked or given on behalf of appellee. The jury returned a verdict in favor of appellee for $6,260. Motion for new trial was overruled and judgment rendered for the amount of the verdict and costs.

The case comes here by appeal.

Mr. J. L. HITE, for appellant.

The refusal of the court to grant a new trial was erroneous, because the conductor and engineer, through whose carelessness and disobedience of orders plaintiff was injured, were his fellow-servants, working under a common master, and co-operating with each other in doing a particular piece of work.

The principal is not liable to one servant for the careless ness of another servant where both are engaged in a common employment, if the principal has used care in the selection of the fellow-servant. Honner v. I. C. R. R. Co., 15 Ill. 550.

Where competent servants have been selected to perform a duty, one of them can not recover against the master for the carelessness of a fellow-servant, and it will be understood that each servant who engages in a particular business calculates the hazards incident to it, and contends accordingly. I. C. R. R. Co. v. Cox, 21 Ill. 20; Moss v. Johnson, 22 Ill. 633; C. & A. R. R. Co. v. Keefe, 47 Ill. 108; C. & A. R. R. Co. v. Murphy, 53 Ill. 336.

The engineer, brakemen and shovelers employed on a construction train are all co-servants, engaged in the same branch of service, and a shoveler who is injured through the negligence of the engineer or trackmen can not recover from their common employer for such injury, if the employer has used due diligence in their selection. And there was no claim made or proved that the employer was guilty of negligence in

selecting its employes who were working with the plaintiff. St. L. & S. E. R. R. Co. v. Britz, 72 Ill. 256; T., W. & W. R. R. Co. v. Durkin, 76 Ill. 395.

We have cited these cases to show how they have by evolution led to the decision in the Abend case, 111 Ill. 202, where the court is at last called upon to decide, not only what facts establish the relation of fellow-servants of a common employer, but also what the facts were in the case.

. Messrs. FLANNIGEN & CANBY, for appellee.

The collision and consequent injury to appellee were occasioned by the negligence and fault of appellant's train dispatcher in failing to send to Conductor Culbertson a proper and necessary order, notifying him that passenger train No. 47 was behind time, and that for such negligence the company is liable. C. B. & R. R. Co. v. McLallen, 84 Ill. 109; Darrigan v. N. Y. & N. E. R. R. Co., 52 Conn. 306; Sheehan v. N. Y. C. & H. R. R. R. Co., 91 N. Y. 332; L. C. & L. R. R. Co. v. Cavens, 9 Bush, 560; P., C. & C. R. R. Co. v. Henderson, 37 O. St. 549.

A railroad company is bound to adopt such rules and regulations for the running of its trains as will insure safety, and having adopted them to conform to them or be responsible for consequences resulting from a departure from them. C. & N. W. R. R. Co. v. Taylor, 69 Ill. 461; C., B. & Q. R. R. Co. v. George, 19 Ill. 510.

The question of negligence is one of fact, which must be left to the jury for determination. I. C. R. R. Co. v. Cragin, 71 Ill. 177; Northern Line Packet Co. v. Binninger, 70 Ill. 571; G. & C. U. R. R. Co. v. Dill, 22 Ill. 264; Burkett v. Bond, 12 Ill. 87; T., P. & W. R. R. Co. v. Foster, 43 Ill. 415; C. & A. R. R. Co. v. Pennell, 94 Ill. 448.

The plaintiff, a common laborer, is not a fellow-servant with the train dispatcher. C., B. & Q. R. R. Co. v. McLallen, 84 Ill. 109; Darrigan v. N. Y. & N. E. R. R. Co., 52 Conn. 306; Sheehan v. N. Y. C. & H. R. R. R. Co., 91 N. Y. 332; Louisville, etc., R. R. Co. v. Cavens, 9 Bush. 560.

The conductor was not a fellow-servant with plaintiff, and

C. & A. R. R. Co. v. McDonald.

that for his negligence in this case the plaintiff would be entitled to recover. In order to constitute servants of the same master " fellow-servants," within the rule *respondeat superior*, it is not enough that they were engaged in doing parts of some work, or in the promotion of some enterprise carried on by the master not requiring co-operation, nor bringing the servants together or into such personal relations that they could have exercised an influence one upon the other promotive of proper caution in respect to their mutual safety; but it is essential either that they were actually co-operating at the time of the injury in the particular business in hand, or that their usual duties should bring them into habitual consociation so that such proper caution would be likely to result. C. & N. W. R. R. Co. v. Moranda, 93 Ill. 302; C. & N. W. R. R. Co. v. Moranda, 108 Ill. 576.

Who are fellow-servants, is a question of fact for the jury. C., B. & Q. R. R. Co. v. Bell, 112 Ill. 360; C. & N. W. R. R. Co. v. Moranda, 108 Ill. 576; I. & St. L. R. R. Co. v. Morgenstern, 106 Ill. 216.

We are aware it has been held by the Supreme Court of the State that the engineer, brakemen and shovelers employed on a construction train are all co-servants, engaged in the same branch of service. St. L. & S. E. R. R. Co. v. Britz, 72 Ill. 256; I. C. R. R. Co. v. Keen, 72 Ill. 512; C. & A. R. R. Co. v. Keefe, 47 Ill. 108.

But it has never been held by our court, so far as we have been able to discover, that a conductor of a construction train, with power to direct and control its movements, is a fellow-servant with a common laborer on such train.

It has been held, however, in other courts, that the conductor of a construction train is not a fellow-servant with a gang of laborers. St. P. & C. R. R. Co. v. Lundstorm, 16 Neb. 254; Moon v. Richmond & A. R. R. Co., 20 Iowa, 562; Little Miami R. R. Co. v. Stevens, 20 Ohio, 415.

And it has been held by the highest court in the land that a conductor, who has charge of a train and commands its movements, is not a fellow-servant with the engineer so as to produce a recovery by the latter against the company for an

injury resulting from the conductor's negligence. C., M. & C. R. R. Co. v. Ross, 112 U. S. 377, and cases cited.

It is immaterial whether the conductor or foreman of the train were fellow-servants of plaintiff or not; if the accident was the result of the mutual and concurrent negligence of the company represented by its train dispatcher and the conductor or foreman of the train, the company would still be liable. Grand Trunk R. R. Co. v. Cummings, 106 U. S. 700; P., C. & C. R. R. Co. v. Henderson, 37 Ohio St. 549; Elmer v. Locke, 135 Mass. 575; Busch v. Buffalo Creek R. R. Co., 29 Hun, 112; Boyce v. Fitzpatrick, 80 Ind. 526.

WILKIN, P. J.    There are two theories upon which appellee's cause of action is based, and they are set forth in the first and second counts of his declaration.    There is no evidence tending to support the third.    There is no controversy of fact on the first count as to the allegation of negligence.    Appellant concedes that whatever injury resulted to appellee by reason of the alleged accident was occasioned by the negligence of the engineer and conductor, or one of them; but maintains that they were fellow-servants with him at the time of the injury, and that therefore, in the absence of allegation or proof that it had failed to use due care in their selection, it is not liable.    Appellee admits that by the law of this State this position is well taken, if the relation of fellow-servants existed, but he insists that as to the conductor, Culbertson, the evidence does not establish that relation.    That the train in question was a construction train, and nothing more, is admitted; that the conductor, engineer, brakeman, fireman and workmen, including the appellee, all belonged to it and worked together is also conceded.    It is admitted by counsel for appellee, that under this state of facts, by repeated decisions of the Supreme Court, the engineer, brakeman, fireman and workmen are held to be fellow-servants, engaged in the same branch of service, and hence the common master is not liable for any injury to one of them through the negligence of another; but they earnestly argue that the conductor sustains a different relation to the other employes connected with his

train, and as to his negligent acts, the same rule should not apply. This position is not based on the theory that he and the shovelers are not *consociated* with each other, within the requirement of the rule announced in the Moranda and other cases decided by the Supreme Court. In fact, it is difficult to conceive how it could be maintained that he sustains a different relation to them, in that regard, from that of the engineer or brakeman. The ground upon which the distinction is sought to be maintained is, that the conductor, being the superior officer of a train, and having the sole management and control of its movements, stands in the position of a vice principal, or as the "personal representative of the corporation." Whatever reason or authority may be adduced in support of this position, when applied to conductors of trains running on schedule time and under general rules, we do not consider it an open question in this State. T., W. & W. R. R. Co. v. Durkin, 76 Ill. 395 ; Clark v. C., B. & Q. R. R. Co., 92 Ill. 43 ; Aben v. T. H. & I. R. R. Co., 111 Ill. 210. Nor is the reasoning in the case of C., M. & C. R. R. Co. v. Ross, 112 U. S. 337, and other cases, holding that certain superior employes of a corporation are to be held as vice principals, applicable to the facts in this case. It needs no argument to show that the position of a conductor in charge of a regular train is altogether different from that of one in charge of a mere construction train. The latter, as shown by the evidence in this case, acts under special orders at all times in the movement of his train, and is engaged in special service. On the first count the case is not distinguishable from that of the T. H. & I. v. Aben, *supra*, by fair construction and on that count the law must be held with appellant. The second count fails to specifically charge any act of negligence on the part of the train dispatcher, but alleges generally that the injury resulted through his neglect in permitting the two trains to come together, it being his duty to direct and control their movements. It is said in the argument that the evidence shows that he was guilty of negligence in failing to notify the conductor of the work train that No. 47 was late, and that omission caused or contributed to the injury of appellee. The right to recover

under this count is based on that theory. The only evidence tending to support this view of the case is that of Conductor Culbertson, given substantially, if not literally, in the foregoing statement. Railroad companies should be, and are by the law, held to a high degree of care and diligence in the adoption and enforcement of all needful rules and regulations to avoid collisions of trains, and if it can be fairly said from the evidence here, that the two trains in question were thrown together through the failure of appellant to provide for the government of its employes and officers such rules, its legal liability follows. And although there was no express rule of the company making it the duty of train dispatchers to notify those in charge of wild, or work trains, that regular passenger trains were late, yet if under all the circumstances proved such notice was reasonably necessary to prevent the collision, the failure of the dispatcher, who had control of the movement of all trains, to give it, would be negligence, and appellant liable. There is no pretense on the part of appellant that such notice was given, and therefore, by determining whether or not it was necessary, and whether or not the injury was the result of the failure to give it, we shall be able to settle the question of liability under the second count. In the absence of such notice, what were the rights and duties of the conductor of the wild train, and what had the train dispatcher a right to presume he would do? There can be, and there is, no dispute as to the fact that, by his working orders for that day and the general rules of the company, under which he says he was working, and which he fully understood, it was his duty to keep out of the way of No. 47, not only for the number of hours she was late, but as he says until he *knew* she had passed. He testifies: "I had to guard in and guard out. A man running a working train has to fight in and fight out." It is true that an attempt is made in his redirect examination to confine his construction and understanding of the rules as to the rights of wild trains, to regular trains on time, but his testimony, all considered, bears no such construction and would be absurd if it did. A rule which would permit all wild or irregular trains to occupy the track against

regular trains, whenever the latter were off their schedule time, would be worse than nonsensical. These rules can not be so construed, nor did Culbertson so understand them. It is therefore clear that obedience to what he understood to be his plain duty, in the absence of notice or orders from the train dispatcher, would have prevented Culbertson's moving his train on the main line, where the collision occurred, until No. 47 had passed; and up to the time the collision occurred the train dispatcher had no more reason to anticipate disobedience to the working order and rules of the company than he would have had for believing that a dispatch giving notice that 47 was late, would be disregarded if delivered to him. Again, did the failure to give notice of the fact that the passenger train was late, cause the accident? A direct answer to this question is found in the evidence of Culbertson.

He swears: "I would not have started out that evening if I had not seen or if one of my men had not seen No. 47 go by first; if we had not, then in the absence of any order I would have stayed there; failing to get an order would not have caused the accident *unless I thought* 47 had passed." It is true he states in another part of his testimony that if he had received the same telegram that Paine and Wright did, the collision would not have occurred; and that perhaps is true, not, however, because it was necessary in order to fix his duty in the premises, but because he would have believed the dispatch, rather than his engineer, or taken steps to verify the statement of the latter. There can be no doubt that whatever necessity there was for notice from the train dispatcher as to the delay of No. 47, arose from the false statement of the engineer, and that alone. The train dispatcher had no knowledge of such false statement being made. It certainly can not be said that it was his duty to assume that false information would be communicated to Culbertson; or that he would act upon it if given. He had a right to presume that he would do his duty. That duty requiring him to keep out of the way of 47, until he *knew* it had passed, and such knowledge being within the power of Culbertson, beyond peradventure, the dispatch or notice as the facts then appeared was wholly unnecessary. Whether the true reason for sending orders to Paine and Wright and not to Culbertson, is given

by the train dispatcher, or whether there existed any reason whatever therefor, is wholly immaterial. The mere fact that they had orders based on the fact that 47 was late, could in no sense change or affect the question of negligence in not notify_ ing Culbertson. The authorities cited by counsel for appellee in support of the proposition that if, through the negligence of train dispatchers or other officials having charge and control of the movement of railroad trains, they are brought into collision, thereby causing injury to employes or others, the company will be liable, certainly announce a correct rule of law; but under the facts of this case they are wholly inapplicable. In the case of Schuhan v. New York Central and Hudson River R. R. Co., 91 N. Y. 332, the reported facts show that train No. 337 was irregular, and west bound from Auburn. No. 50 was a regular train, going east from Cayuga. No. 337 was ordered to Cayuga, regardless of No. 50, but no notice was given to the latter. The two collided, injuring the fireman of No. 337. It was held that there was negligence in not giving notice to No. 50. It need scarcely be said that the facts in that case and this are wholly unlike. There the officers in charge of the irregular train were acting in strict obedience to orders; here the conductor of the wild train in direct disobedience to his orders, and the general rules. The other cases cited are equally inapplicable. The evidence in this record fairly considered, must, we think, force any impartial mind to the conclusion that the facts in appellee's case are truly stated in the first count of his declaration, and not in the second. That his injury resulted from the negligence of the conductor, superinduced by the inexcusable carelessness or wilfulness of the engineer of the work train, and not by reason of any omission of duty on the part of the train dispatcher.

*Reversed and remanded.*

PILLSBURY, J., dissenting. I can not concur in this opinion. The evidence shows to my mind that the negligence of the train dispatcher, at least, concurred with that of the conductor in producing the injury, and in such case, even if the conductor is to be held a fellow-servant with the plaintiff, the action I think can still be maintained.